UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
No. 21-CV-1280

| | | |
|---|---|---|
| Damarlo WEST, | ) | |
| | ) | |
| Plaintiff, | ) | COMPLAINT |
| | ) | SEEKING |
| v. | ) | MONETARY |
| | ) | DAMAGES, |
| CITY OF MINNEAPOLIS, a | ) | DECLARATORY |
| municipal entity; Officer Tyler | ) | JUDGMENT, |
| KLUND, in his individual and | ) | INJUNCTIVE RELIEF |
| official capacity; Sergeant Darcy | ) | |
| KLUND, in his individual and | ) | |
| official capacity; Officer Steven W. | ) | DEMAND FOR JURY |
| MOSEY, in his individual and | ) | TRIAL |
| official capacity; Officer Paul | ) | |
| Luther HUYNH, in his individual | ) | |
| and official capacity; Officer | ) | |
| Alexandra DUBAY in her | ) | |
| individual and official capacity; | ) | |
| Officer Richard Curtis WALKER, in | ) | |
| his individual and official capacity; | ) | |
| Officer Gabriel Daniel GROUT, in | ) | |
| his individual and official capacity; | ) | |
| Officer Justin STETSON, in his | ) | |
| individual and official capacity; | ) | |
| and Officer DOE, in his individual | ) | |
| and official capacity, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## GENERAL INTRODUCTION

1.    This is an action seeking money damages under 42 U.S.C. § 1983 for

Defendants' violations of Plaintiff's constitutional rights under the

Fourth and Fourteenth Amendments to the United States

Constitution, and for Defendants' conspiracy to deprive Plaintiff of his civil rights.

2. This action also states common law battery, negligence, and negligent infliction of emotional distress claims pursuant to Minn. Stat. § 466.02 against Officer Tyler Klund, in his individual and official capacity, and against the City of Minneapolis, Minnesota for the actions of its agent and employee.

3. On July 14, 2020, Tyler Klund engaged in an action which resulted in the unreasonable seizure of Plaintiff by using excessive force against Plaintiff while effecting an arrest, thereby violating his rights under the Fourth Amendment to the United States Constitution, as made applicable to the States by the Fourteenth Amendment, as well as his rights to Due Process under the Fourteenth Amendment.

4. Defendant Tyler Klund violated Plaintiff's constitutional rights because of, *inter alia*, the policies or customs of the City of Minneapolis and the Minneapolis Police Department, under the supervision of Minneapolis Police Chief Medaria Arradondo and Minneapolis Mayor Jacob Frey.

5. Defendant Tyler Klund committed a common law battery against Plaintiff for which the City of Minneapolis must assume liability under Minn. Stat. § 466.02.

6.    Defendant Tyler Klund breached his duty of reasonable care by (1) arresting Plaintiff in an unconstitutional manner, (2) unnecessarily harming Plaintiff in the execution of his arrest, and (3) failing to use only the minimal amount of force necessary to affect the arrest. Defendant Tyler Klund breached this duty by stomping on Plaintiff's head, neck, and back repeatedly while Plaintiff lay prone on the ground. This constitutes common law negligence for which the City of Minneapolis must assume liability under Minn. Stat. § 466.02.

## PARTIES

### Plaintiff: Damarlo West

7.    Plaintiff Damarlo West was born in Minneapolis, Minnesota. He is a United States citizen.

8.    Mr. West is currently incarcerated at Sherburne County Jail in Elk River, Minnesota.

### Defendant: City of Minneapolis

9.    Defendant City of Minneapolis ("Minneapolis" or "the City") is a municipal corporation duly organized and existing under the Constitution and laws of the State of Minnesota.

10.   The Minneapolis Police Department ("MPD") is a local government entity and an agency of Defendant Minneapolis, and all actions of the MPD are the legal responsibility of Minneapolis.

11.   Minneapolis is sued in its own right on the basis of its policies, customs, and practices which gave rise to Plaintiff's federal rights claims.

12.   Minneapolis Mayor Jacob Frey ("Frey") is, and was at all times relevant to this action, the Mayor of Minneapolis and the chief policy maker responsible for authorizing MPD's use of force.

13.   Minneapolis Police Chief Medaria Arradondo ("Arradondo") is, and was at all times relevant to this action, the MPD police chief and a policymaker for his department.

## Defendant: Minneapolis Officer Tyler Klund

14.   Plaintiff is informed, believes, and thereupon alleges that Officer Tyler Klund was the agent, servant, and employee of Defendant Minneapolis and/or the MPD at all times relevant to this Complaint.

15.   Defendant Tyler Klund is sued both in his individual and official capacity.

16.   For purposes of Plaintiff's claims under 42 U.S.C. § 1983, Defendant Tyler Klund is sued in his *individual* capacity. While Plaintiff also faults Defendant Tyler Klund for the actions performed in his *official* capacity, these harms are imputed to the City of Minneapolis and need not be realleged.

17.   For purposes of Plaintiff's claims under 42 U.S.C. § 1983 against the City of Minneapolis, Defendant Tyler Klund is sued in his *official* capacity.

18.   For purposes of Plaintiff's state law claims, Defendant Tyler Klund is sued in his *official* capacity only.

19.   Plaintiff is informed, believes, and thereupon alleges that Defendant Tyler Klund, in addition to the other named Defendants, is factually and proximately responsible for the damages and injuries alleged herein.

20.   Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Tyler Klund was the agent, servant, and employee of Defendant Minneapolis and was acting at all times within the scope of his agency and employment and with the knowledge and consent of his principal and employer.

21.   At all relevant times, Defendant Tyler Klund was acting under color of state law.

22.   Plaintiff is informed, believes, and thereupon alleges that the practices, policies, and customs of Minneapolis or the MPD caused the unlawful action taken against Plaintiff.

## **Defendant: Minneapolis Sergeant Darcy Klund**

23.    Plaintiff is informed, believes, and thereupon alleges that Sergeant

Darcy Klund was the agent, servant, and employee of Defendant

Minneapolis and/or the MPD at all times relevant to this Complaint.

24.    Defendant Darcy Klund is Defendant Tyler Klund's father.

25.    Defendant Darcy Klund is sued both in his individual and official

capacity.

26.    Plaintiff is informed, believes, and thereupon alleges that Defendant

Darcy Klund, in addition to the other named Defendants, is factually

and proximately responsible for the damages and injuries alleged

herein.

27.    Plaintiff is informed, believes, and thereupon alleges that, at all times

relevant hereto, Defendant Darcy Klund was the agent, servant, and

employee of Defendant Minneapolis and was acting at all times

within the scope of his agency and employment and with the

knowledge and consent of his principal and employer.

28.    At all relevant times, Defendant Darcy Klund was acting under color

of state law.

## **Defendant: Minneapolis Officer Steven Mosey**

29.    Plaintiff is informed, believes, and thereupon alleges that Officer

Steven Mosey was the agent, servant, and employee of Defendant

Minneapolis and/or the MPD at all times relevant to this Complaint.

30.    Defendant Steven Mosey is sued both in his individual and official

capacity.

31.    Plaintiff is informed, believes, and thereupon alleges that Defendant

Steven Mosey, in addition to the other named Defendants, is factually

and proximately responsible for the damages and injuries alleged

herein.

32.    Plaintiff is informed, believes, and thereupon alleges that, at all times

relevant hereto, Defendant Steven Mosey was the agent, servant, and

employee of Defendant Minneapolis and was acting at all times

within the scope of his agency and employment and with the

knowledge and consent of his principal and employer.

33.    At all relevant times, Defendant Steven Mosey was acting under color

of state law.

## **Defendant: Minneapolis Officer Paul Luther Huynh**

34.    Plaintiff is informed, believes, and thereupon alleges that Officer

Paul Luther Huynh was the agent, servant, and employee of

Defendant Minneapolis and/or the MPD at all times relevant to this Complaint.

35. Defendant Paul Luther Huynh is sued both in his individual and official capacity.

36. Plaintiff is informed, believes, and thereupon alleges that Defendant Paul Luther Huynh, in addition to the other named Defendants, is factually and proximately responsible for the damages and injuries alleged herein.

37. Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Paul Luther Huynh was the agent, servant, and employee of Defendant Minneapolis and was acting at all times within the scope of his agency and employment and with the knowledge and consent of his principal and employer.

38. At all relevant times, Defendant Paul Luther Huynh was acting under color of state law.

**Defendant: Minneapolis Officer Alexandra Dubay**

39. Plaintiff is informed, believes, and thereupon alleges that Officer Alexandra Dubay was the agent, servant, and employee of Defendant Minneapolis and/or the MPD at all times relevant to this Complaint.

40. Defendant Alexandra Dubay is sued both in her individual and official capacity.

41.   Plaintiff is informed, believes, and thereupon alleges that Defendant Alexandra Dubay, in addition to the other named Defendants, is factually and proximately responsible for the damages and injuries alleged herein.

42.   Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Alexandra Dubay was the agent, servant, and employee of Defendant Minneapolis and was acting at all times within the scope of her agency and employment and with the knowledge and consent of her principal and employer.

43.   At all relevant times, Defendant Alexandra Dubay was acting under color of state law.

### Defendant: Minneapolis Officer Richard Curtis Walker

44.   Plaintiff is informed, believes, and thereupon alleges that Officer Richard Curtis Walker was the agent, servant, and employee of Defendant Minneapolis and/or the MPD at all times relevant to this Complaint.

45.   Defendant Richard Curtis Walker is sued both in his individual and official capacity.

46.   Plaintiff is informed, believes, and thereupon alleges that Defendant Richard Curtis Walker, in addition to the other named Defendants, is

factually and proximately responsible for the damages and injuries alleged herein.

47. Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Richard Curtis Walker was the agent, servant, and employee of Defendant Minneapolis and was acting at all times within the scope of his agency and employment and with the knowledge and consent of his principal and employer.

48. At all relevant times, Defendant Richard Curtis Walker was acting under color of state law.

## **Defendant: Minneapolis Officer Gabriel Daniel Grout**

49. Plaintiff is informed, believes, and thereupon alleges that Officer Gabriel Daniel Grout was the agent, servant, and employee of Defendant Minneapolis and/or the MPD at all times relevant to this Complaint.

50. Defendant Gabriel Daniel Grout is sued both in his individual and official capacity.

51. Plaintiff is informed, believes, and thereupon alleges that Defendant Gabriel Daniel Grout, in addition to the other named Defendants, is factually and proximately responsible for the damages and injuries alleged herein.

52.   Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Gabriel Daniel Grout was the agent, servant, and employee of Defendant Minneapolis and was acting at all times within the scope of his agency and employment and with the knowledge and consent of his principal and employer.

53.   At all relevant times, Defendant Gabriel Daniel Grout was acting under color of state law.

## **Defendant: Minneapolis Officer Justin Stetson**

54.   Plaintiff is informed, believes, and thereupon alleges that Officer Justin Stetson was the agent, servant, and employee of Defendant Minneapolis and/or the MPD at all times relevant to this Complaint.

55.   Defendant Justin Stetson is sued both in his individual and official capacity.

56.   Plaintiff is informed, believes, and thereupon alleges that Defendant Justin Stetson, in addition to the other named Defendants, is factually and proximately responsible for the damages and injuries alleged herein.

57.   Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Justin Stetson was the agent, servant, and employee of Defendant Minneapolis and was acting at all times

within the scope of his agency and employment and with the knowledge and consent of his principal and employer.

58. At all relevant times, Defendant Justin Stetson was acting under color of state law.

## Defendant: Minneapolis Officer Doe

59. Plaintiff is informed, believes, and thereupon alleges that an additional officer was present on the scene, and this officer was the agent, servant, and employee of Defendant Minneapolis and/or the MPD at all times relevant to this Complaint.

60. Plaintiff does not yet know the true name and capacity of Defendant sued herein as Officer Doe and therefore sues this Defendant by such fictitious name. Plaintiff will amend this Complaint to allege his true name and capacity when ascertained.

61. Defendant Doe is sued both in his individual and official capacity.

62. Plaintiff is informed, believes, and thereupon alleges that Defendant Doe, in addition to the other named Defendants, is factually and proximately responsible for the damages and injuries alleged herein.

63. Plaintiff is informed, believes, and thereupon alleges that, at all times relevant hereto, Defendant Doe was the agent, servant, and employee of Defendant Minneapolis and was acting at all times within the

scope of his agency and employment and with the knowledge and consent of his principal and employer.

64. At all relevant times, Defendant Doe was acting under color of state law.

## JURISDICTION & VENUE

65. This Court has jurisdiction under 28 U.S.C. § 1331 (federal question jurisdiction), 28 U.S.C. § 1343 (civil rights jurisdiction), 28 U.S.C. § 1651 (All Writs Act), 28 U.S.C. § 2201 (declaratory judgment), and 42 U.S.C. §§ 1983, 1988. Supplemental jurisdiction over state claims is appropriate as the events in question "derive from a common nucleus of operative fact." 28 U.S.C. § 1367; *United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 725 (1966).

66. Venue properly lies in the District of Minnesota under 28 U.S.C. § 1391(e)(1) because all the events giving rise to this claim occurred in this district, all Defendants reside in this district, and no real property is involved in this action.

## FACTUAL BACKGROUND

67. On July 14, 2020, Plaintiff went to a restaurant, JJ Fish & Chicken, located at 904 W. Broadway Avenue in Minneapolis.

68. While in the restaurant, Plaintiff used the restroom. As he exited the restroom, he saw police officers entering the restaurant.

69.   Several officers, some in uniform and some in plain clothes, stormed into the restaurant with guns drawn.

70.   The officers proceeded to yell, "Put your hands up!" and "Get down on the ground!" The officers did not announce who they were looking for or talking to, and Plaintiff was not the only person in the restaurant.

71.   Plaintiff did not know that the officers were looking for him or that there was any reason for the officers' actions to be directed at him.

72.   The officers slammed Plaintiff to the ground. Plaintiff had put his hands up and was not able to catch or soften his fall.

73.   While he was on the ground, Defendant Tyler Klund stomped hard on Plaintiff's head, neck, back, and shoulders several times. It is believed and alleged that Defendant Klund was wearing steel-toed shoes/boots when this occurred.

74.   When Defendant Tyler Klund stomped on Plaintiff's head, Plaintiff's head bounced off the hard restaurant floor.

75.   As Defendant Tyler Klund was standing on Plaintiff's neck and shoulder area, two officers came up behind Plaintiff, one officer grabbing his left arm and the other officer grabbing his right arm. These officers are believed and alleged to be Defendant Doe (left arm) and Defendant Huynh (right arm).

76.  Some of the Defendants eventually brought Plaintiff to his feet, led him out of the restaurant, and placed him in a squad car.

77.  At this point, Plaintiff felt some minor bruising in his face but was not aware he had been seriously injured since adrenaline was coursing through his body and the pain had not fully set in yet.

78.  Without waiting for Plaintiff's adrenaline to subside, Defendant Steven Mosey briefly asked Plaintiff if he was okay, and Plaintiff responded in the affirmative. No further inquiries as to Plaintiff's physical well-being were made by any of the Defendant officers.

79.  Defendants took Plaintiff to the Fourth Precinct, then to the First Precinct, where they questioned him about a shooting in downtown Minneapolis. Plaintiff denies any involvement in the shooting.

80.  Plaintiff was subsequently taken to Sherburne County Jail, where he was booked.

81.  Plaintiff has complained about myriad symptoms numerous times to medical staff and has specifically asked for an MRI. Plaintiff's symptoms have included or continue to include, but are not limited to, constant migraines (sometimes multiple migraines per day), extreme neck stiffness and soreness, insomnia, depression, anxiety, memory loss, and decreased motor skills.

82.  On April 7, 2021, Plaintiff, through counsel, requested that Sherburne County Jail arrange for Plaintiff to receive an MRI at Plaintiff's expense. Sherburne County Jail and the U.S. Marshals have refused to arrange for Plaintiff to receive an MRI.

83.  Until May of 2021, Plaintiff has not been seen by any medical provider outside the jail. A nurse practitioner at Sherburne County decided Plaintiff's symptoms did not merit an MRI. Plaintiff had not been seen by a doctor since being injured on July 14, 2020 until sometime in May of 2021, and only after counsel repeatedly emphasized to Sherburne County the severity of Plaintiff's head and neck injuries.

84.  In May of 2021, when Plaintiff was finally allowed to speak with a real doctor by videoconference technology, the doctor prescribed Plaintiff new medicine for his neck injury, but it is still unknown whether Sherburne will give Plaintiff the medication because they are apparently unconvinced that the type of medication prescribed can be given to an inmate at Sherburne County, despite the fact that Sherburne County Jail has full control over the dispensation of all medicine provided to inmates.

85.  At all points relevant to the arrest, Defendant Doe's body-worn camera was activated.

86.  At the time of this filing, only Defendant Doe's body-worn camera ("BWC") footage and Defendant Huynh were disclosed to Plaintiff, via his attorney, in Plaintiff's criminal proceedings stemming from the arrest.

87.  According to police reports turned over to Plaintiff's criminal attorney on or around August 26, 2020, the following officers were at the scene of Plaintiff's arrest: (1) Defendant Tyler Klund, (2) Defendant Mosey, (3) Defendant Grout, (4) Defendant Dubay, (5) Defendant Walker, (6) Defendant Stetson, and (7) Defendant Huynh, (8) Officer Daoheuang, and (9) Officer Osbeck Jr. (#5377). It also appears from Defendant Mosey's first police report that Defendant Sergeant Darcy Klund may have been at the scene as well, as Defendant Mosey reported that "Sgt. Klund was the case supervisor so he took custody of the def."

88.  Neither Officer Doaheuang nor Officer Osbeck Jr. wrote up any report after Plaintiff's arrest, or those reports were not turned over to Plaintiff's criminal defense attorney. It also appears from the reports that Officer Doe was not named in any of the reports and did not write a report (or Officer Doe's report was not turned over to Plaintiff's criminal defense attorney).

89.  The police reports (i.e., a Use of Force Review) show that Defendant Mosey was the on-site supervisor for the MPD officers. Defendant

Mosey's report acknowledges that force was used against Plaintiff. Defendant Mosey's Use of Force Review also states that the arrest event was not captured on any other video other than the Defendants' BWCs.

90.   Plaintiff, on information and belief, alleges that the restaurant in which Plaintiff was arrested had video cameras that captured the event. Defendants could have obtained that footage but instead intentionally chose not to do so.

91.   The fruits of a recently filed Open Data request indicate that Defendants obtained security camera footage that showed the outside of JJ Fish and Chicken, which means Defendants had ample opportunity to also obtain the security camera footage from the inside of JJ Fish and Chicken, but instead chose to let that critical evidence spoliate.

92.   Defendants intentionally chose not to obtain the security footage from the security cameras inside JJ Fish and Chicken. The evidence would have aided Plaintiff in his criminal defense proceedings and the instant civil rights proceedings. After all, the footage would have demonstrated that Defendants violated Plaintiff's constitutional and statutory rights at the time of Plaintiff's arrest.

93.    According to the police reports that were disclosed to Plaintiff's criminal defense attorney, all officers who wrote a report, other than Defendant Tyler Klund and Defendant Stetson, stated their BWC was turned on at all relevant times; Defendant Mosey stated that he reviewed Defendant Tyler Klund's BWC, indicating it was also turned on. However, only two sets of BWC footage *of the arrest itself* were turned over to Plaintiff's criminal defense attorney or to undersigned counsel in response to an Open Data request filed on behalf of Plaintiff.

94.    According to police reports, Defendant Tyler Klund and Defendant Mosey were the first two officers to arrive at the scene.

95.    Defendant Tyler Klund's police report provides that he ordered Plaintiff to the ground "but he did not comply to officers commands." Defendant Tyler Klund then reports running up to Plaintiff "to take him to the ground to prevent him from gaining access" to a firearm. Defendant Tyler Klund reports he "attempted to step on [Plaintiff's] back and his right shoulder numerous times to prevent him from retrieving what [he] believed to be [a] firearm." Defendant Tyler Klund reported that "[o]ther officers arrived on scene and were able to assist."

96.   None of the BWC footage that was turned over to Plaintiff shows Defendant Tyler Klund ordering Plaintiff to get on the ground, nor does the BWC footage show Defendant Klund's takedown of Plaintiff.

97.   In order to not provide Plaintiff with BWC footage of Defendant Tyler Klund ordering Plaintiff to the ground or taking Plaintiff to the ground, Defendants must have either lied in their police reports about Defendant Tyler Klund's and Defendant Steven Mosey's BWCs being turned on or must have intentionally failed to disclose key BWC footage to Plaintiff despite Plaintiff's discovery demands in his criminal proceedings and Plaintiff's parallel Open Data request that sought *all* BWC footage from the arrest.

98.   Defendant Tyler Klund's report was not written until the day after the arrest, which violates MPD policy 5-301, § IV-B(2)(b), which requires all Force Reporting to be completed as soon as practical, "but no later than the end of the shift."

99.   Defendant Mosey's first police report provides that he and Defendant Tyler Klund were the first officers to enter the chicken place at 904 W Broadway. Defendant Mosey reported that he gave Plaintiff "verbal commands to get on the ground" and that Plaintiff "first put his hands in the air, but then he reached down with his right hand and grabbed the but [sic] of a gun that was in his waistband." Defendant Mosey

reports that Defendant Tyler Klund forced Plaintiff to the ground and that he "observed Officer [Tyler] Klund stepping on [Plaintiff's] shoulder and arm area in what [he] believe[d] was an attempt to disarm" Plaintiff. Defendant Mosey stated he immediately started his force review and "did not observe any injuries" on Plaintiff.

100. Defendant Mosey did not make any attempt to follow up with Plaintiff to determine later whether any injuries had been noted after Plaintiff's adrenaline subsided. Defendant Mosey did not ask any probing questions about whether Plaintiff had any head or neck injuries, despite Defendant Mosey's knowledge that Plaintiff had just been repeatedly stomped on the head.

101. Defendant Mosey reported, "[t]here was a crowd in the immediate area so [he] directed all officers to transport" Plaintiff to the Fourth Precinct for further examination. Defendant Mosey reported that, while "enroute to the [Precinct] [they] were diverted to assist on a possible vehicle with a gun." Defendant Mosey reported that he "later asked Sgt. [Darcy] Klund to complete the use of force review including further physical examination and further questioning" and that "Sgt. [Darcy] Klund submitted a supplement documenting the force review." Defendant Mosey reported that he reviewed his own BWC and

"reviewed Officer [Tyler] Klund's BWC of the incident." Defendant
Mosey stated that "[t]he amount and type of force was justified."

102. Defendant Mosey's report was not written until the day after the
arrest, which is against MPD policy 5-301, § IV-B(2)(b), which
requires all Force Reporting to be completed as soon as practical, "but
no later than the end of the shift."

103. Defendant Mosey intentionally lied in his various reports by stating
that there was no other video of the arrest other than BWC footage.

104. Defendant Mosey intentionally lied in his police report by stating that
Defendant Tyler Klund was merely "stepping on" Plaintiff (rather
than stomping) and by saying that this "stepping" was on Plaintiff's
arm and shoulder, rather than on Plaintiff's head, neck, back, and
shoulder.

105. Defendant Tyler Klund's and Defendant Mosey's reports conflict in
terms of the places that Defendant Tyler Klund stomped on Plaintiff,
and also in the description of Plaintiff's level of compliance with initial
commands.

106. Defendant Darcy Klund is Defendant Tyler Klund's father.[1]

---

[1] *See* Brandt Williams, *Cop Who Killed Ruszcyck Took Unconventional Path
to Becoming Officer*, MPR News (July 26, 2017),
https://www.mprnews.org/story/2017/07/26/cop-who-killed-ruszczyk-took-
unconventional-path-to-becoming-officer (the third photo down, reproduced



***Defendant Tyler Klund on the left, Defendant Darcy Klund on the right***

107. According to Defendant Mosey's report, he specifically chose to let Defendant Tyler Klund's father conduct the Supervisor Force Review of his own son. Despite this, Defendant Darcy Klund's name is not on any Supervisor Force Review report that was disclosed to Plaintiff's criminal defense attorney; the only one that was disclosed has Defendant Mosey's name on the report.

108. Defendant Darcy Klund is proud of his son and would do almost anything to help him avoid getting in trouble for using excessive force,

---

above, shows Defendant Darcy Klund hugging Defendant Tyler Klund with the caption "Minneapolis police Sgt. Darcy Klund embraced his son Tyler Klund after he pinned his new badge on Tyler during a swearing-in ceremony 2015.").

including conspiring to hide evidence of his son's excessive force, to lie on reports, and to otherwise conspire to deprive Plaintiff of his civil rights by decreasing his incentive and ability to hold Defendant Tyler Klund responsible for his unlawful actions in a court of law.

109. Between July 14, 2020 and July 15, 2020, Defendant Darcy Klund, Defendant Mosey, and Defendant Tyler Klund hatched a plan to omit or destroy evidence (including but not limited to BWC footage of the arrest), to alter or convince others to alter police reports, to fail to collect critical evidence helpful to Plaintiff and harmful to Defendants (i.e., the security footage from the inside of JJ Fish and Chicken that recorded the arrest), and to otherwise misconstrue the course of events and severity of the harm inflicted on Plaintiff by Defendant Tyler Klund. All of this was done with the express or implied object of depriving Plaintiff of his civil and constitutional rights by protecting Defendant Tyler Klund from liability.

110. Based on information and belief, Plaintiff alleges that all other officers at the scene of the arrest are involved in the conspiracy to deprive Plaintiff of his civil and constitutional rights. These officers include all those Defendants named in this Complaint.

## **MPD's Custom of Excessive and Disproportionate Use of Force**

111.   MPD officers have a long history of engaging in excessive force against the civilians they are sworn to protect. These incidents represent a custom that MPD, and by extension Minneapolis, has long ignored and tacitly approved of.

112.   MPD's use of excessive force is so widespread that the Attorney General of the United States announced on April 21, 2021 that the "Justice Department has opened a pattern or practice investigation into the City of Minneapolis (the City) and the Minneapolis Police Department (MPD). The investigation will assess all types of force used by MPD officers. … The investigation will also assess whether MPD engages in discriminatory policing. As part of the investigation the Justice Department will conduct a comprehensive review of MPD policies, training and supervision. The department will also examine MPD's systems of accountability, including complaint intake, investigation, review, disposition and discipline."[2]

---

[2] *Attorney General Merrick B. Garland Announces Investigation of the City of Minneapolis, Minnesota, and the Minneapolis Police Department*, U.S. DEP'T OF JUSTICE (Apr. 21, 2021), https://www.justice.gov/opa/pr/attorney-general-merrick-b-garland-announces-investigation-city-minneapolis-minnesota-and.

113.   The Attorney General's investigation "'will assess whether the
       Minneapolis Police Department engages in a pattern or practice of
       using excessive force.'" *Id.* (quoting Attorney General Garland).

114.   A Star Tribune review[3] found at least eleven instances since 1995 in
       which MPD officers were accused of punching, kicking, or otherwise
       assaulting people who were already restrained. It is unknown how
       many instances actually occurred since not every case attracted media
       attention or resulted in lawsuits or criminal charges.

115.   In 2010, MPD officers killed David Cornelius Smith, who was
       suffering a mental health breakdown, through the use of tasers and
       an overly aggressive restraint.

116.   The officers involved in the death of David Cornelius Smith were not
       criminally charged or disciplined. The Internal Affairs Unit never
       interviewed them.

117.   In 2013, Minneapolis Terrence Franklin was chased into a basement
       and shot dead by five MPD officers.

118.   The officers who killed Terrence Franklin were not criminally charged
       or disciplined.

---

[3] Libor Jany, *Chauvin Case Shines Spotlight on Minneapolis Police History of Mistreatment of Handcuffed Suspects*, STAR TRIB. (Apr. 2, 2021), https://www.startribune.com/chauvin-case-shines-spotlight-on-minneapolis-police-history-of-mistreatment-of-handcuffed-suspects/600041721.

119.  In 2014, MPD officers choked, punched, and handcuffed Alfred
      Flowers before continuing the beating by stomping and kicking him as
      he laid on the ground.

120.  The officers who assaulted Alfred Flowers were not criminally charged
      or disciplined.

121.  Again in 2014, former MPD officer Tou Thao beat Lamar Ferguson on
      the streets of Minneapolis. The officer punched, kicked, and kneed
      Ferguson while he was handcuffed. Ferguson's teeth were shattered,
      and he was hospitalized for four days.

122.  Thao remained on the force and would later be involved in the murder
      of George Floyd, on May 25, 2020. At the time of George Floyd's
      murder, Thao had six police conduct complaints filed against him—
      one remained pending. The other five were closed without discipline.

123.  In 2015, Minneapolis resident Jamar Clark was shot and killed by
      MPD officers.

124.  The officers involved in Jamar Clark's death were not criminally
      charged or disciplined.

125.  In 2016, Minnesota Vikings player Tom Johnson was maced and
      tasered after MPD officers initiated a confrontation with him.

126.   Both officers involved had been previously sued for unreasonable use of force. Neither faced criminal charges or discipline for the altercation with Johnson.

127.   Again in 2016, MPD officers kicked and struck Tomas Garcia-Orihuela as he laid handcuffed on the ground. One of the officers involved had previously been named in two excessive force lawsuits.

128.   In 2017, unarmed Minneapolis resident Justine Ruszcyk was shot and killed in her backyard by former MPD officer Mohamed Noor.

129.   Mohamed Noor became a Minneapolis police officer in 2015 after completing a "fast-tracked" cadet training program. The program allows cadets to join the force without having the requisite two- or four-year degree in criminal justice or a related field.[4] Defendant Tyler Klund graduated from this program alongside Noor.

130.   In 2018, an MPD officer drop-kicked Jeremiah Jermaine Thomas in the chest before additional MPD officers joined in. The officers punched, kneed, and kicked him, causing a punctured lung, internal bleeding, and fractured ribs.

---

[4] Jennifer Bjorhus, *Fast-Track Training Put Officer Mohamed Noor on Minneapolis Police Force*, STAR TRIB. (July 23, 2017), https://www.startribune.com/minneapolis-police-face-questions-about-noor-s-fast-track-training/436057173.

131. In each of the previously listed cases, settlements were reached. This evinces that Defendant Minneapolis was on notice of MPD's ongoing pattern of reckless violence, as the Mayor is notified of all litigation brought against the City and must approve all settlements.

132. The City paid $25,270,182.52 in settlements, claims, or judgments in 274 police misconduct cases between 2003 and April 2019.

133. Derek Chauvin, who was ultimately convicted of second-degree murder for the death of George Floyd, personifies MPD's failure to discipline officers.

134. Before May 25, 2020, at least eighteen complaints were filed against Chauvin, many of which alleged misconduct or excessive force. Only two of those complaints were closed with discipline.

135. Notably, Defendant Steven Mosey has even more complaints filed against him than did Derek Chauvin.

136. Despite his extensive record of citizen complaints, Derek Chauvin was on duty as an MPD officer on May 25, 2020, when he knelt on George Floyd's neck for more than eight minutes. Floyd was prone and handcuffed, yet Chauvin continued kneeling while Floyd pleaded for help, slipped into unconsciousness, and ultimately died.

137. Before Chauvin was convicted of Floyd's murder, the City of Minneapolis settled with Floyd's family for $27 million. Thus, between

2003 and 2021, the City of Minneapolis has paid *at least* $52,270,182.52 in settlements, claims, or judgments arising out of alleged brutality and unconstitutional conduct by the City's police officers.

138.   As recently as May 15, 2021, the MPD made headlines for yet another instance of excessive force and subsequent misconduct from February 2020.[5] MPD officers beat Andre Moore during a traffic stop, leaving him with a bloodied, swollen face and a broken nose. One of the officers involved, Tony Partyka, went on to apply for a no-knock warrant for Moore's apartment.

139.   After several aspects of the warrant raised red flags, a Hennepin County judge found that Partyka intentionally misled the court about his claims of a confidential reliable informant. If the informant existed at all, he was merely a "tipster."

140.   After beating Moore, lying to the Hennepin County Court, and conducting an unconstitutional drug raid on Moore's apartment, Partyka was given no discipline by Minneapolis police.

---

[5] Andy Mannix, *Botched Minneapolis Drug Case Raises Questions Over Secrecy of Informants*, STAR TRIB. (May, 15 2021), https://www.startribune.com/minneapolis-drug-case-falls-apart-raising-questions-about-existence-of-secret-informant/600056732.

141. This pattern of inadequate discipline for inappropriate and unlawful action extends throughout the entirety of the MPD.

142. On December 30, 2020, two of the named Defendants, Defendant Darcy Klund and Defendant Paul Huynh, were involved in killing Dolal Idd, a 23-year-old Somali-American man, shooting over a dozen rounds of gunfire at Mr. Idd. Defendant Darcy Klund, again, was the Sergeant in charge of his team.

143. Community activists have questioned the narrative of the officers involved in the killing of Dolal Idd, and the Dakota County Attorney's Office has opened an investigation to see if the officers were legally justified in using force.

144. Before killing Dolal Idd, Defendant Darcy Klund had received four civilian complaints against him, and Defendant Huynh had received seven civilian complaints against him. The other officer involved in that shooting, Mr. Jason Schmitt, had received 23 civilian complaints against him. None of these civilian complaints resulted in discipline.

145. In 1996, Sergeant Darcy Klund was demoted to officer for an unknown reason before being reinstated after arbitration.

146. Defendant Huynh had been reviewed eight separate times by internal affairs since just 2014. None of the reviews resulted in discipline.

147. In his short career as a police officer, Defendant Tyler Klund has already received at least five civilian complaints, three of which were closed with no discipline and two of which remain open. Defendant Justin Stetson is also part of one of the open complaints. Concerning the closed complaints, Defendant Mosey was also involved in one.

148. Defendant Mosey has had an astounding 24 complaints. In two, it was found there was no probable cause; in one, he was exonerated; in 20, there was no discipline; one complaint remains open. Defendant Mosey has also been named in at least two lawsuits, one of which resulted in a $225,000 settlement paid for by Minneapolis.

149. Defendant Osbeck received 8 complaints over a three-year time period between 2016 and 2019. In seven of those complaints, the City issued no discipline. In one instance, for a seat-belt violation, the City sustained the complaint and issued a letter of reprimand.

150. One of the complaints Defendant Osbeck received, 19-02313, that was closed with no discipline, involved the same Officer Paryka who was recently found to be fabricating evidence and lying to a criminal court in an attempt to have a defendant convicted. *See supra*, ¶¶ 138-40 and n.5.

151.   Defendant Dubay has had no less than 7 complaints filed against her between 2017 and 2019. In each complaint, the City issued no discipline.

152.   One of Defendant Dubay's complaints, 18-20036, also involved Defendant Osbeck. Neither party was disciplined.

153.   Another of Defendant Dubay's complaints, 19-11584, involved Defendant Mosey and an "Unknown" Officer (though its difficult to believe that neither Defendant Dubay nor Defendant Mosey knew who the "Unknown" officer was since they were clearly all acting together). Again, the City issued no discipline for any of the involved parties.

154.   Defendant Walker has received two complaints, one in 2014 and one in 2019. The City did not discipline Defendant Walker for either complaint.

155.   In 2012, a court in the District of Minnesota denied in part Defendant Walker's motion for summary judgment in a case where the Plaintiff, Mr. Wayne Darren Newton, alleged that Defendant Walker was liable to Newton under "claims of excessive force, false arrest, violation of substantive due process, assault, and battery." *Newton v. Walker*, No. 11-CV-1499 (PJS/JJG), 2012 WL 4856163, at *1 (D. Minn. Oct. 12, 2012). According to the Order of the court in that case:

Walker approached Newton, **Newton put up his hands and stepped back.** Newton Dep. 49; Knighten Aff. ¶ 7. **Walker fired the taser twice, and Newton fell to the ground.** Newton Dep. 49; Knighten Aff. ¶ 7. **Walker did not say a word to Newton before firing his taser.** Newton Dep. 50. While on the ground, Newton shook and then became very still. Knighten Aff. ¶ 7. **Knighten asked Walker, "Why did you do that?" and Walker replied "He knows why!"** Knighten Aff. ¶ 7. A few minutes later, Newton was arrested, handcuffed, and placed in a squad car. Newton Dep. 51; Knighten Aff. ¶ 8. **As a result of the tasering, Newton suffered excruciating pain, bruises, and a bleeding cut on his arm.** Newton Dep. 36–37, 51; Knighten Aff. ¶ 8. He later felt depressed, embarrassed, and humiliated by the incident. Newton Dep. 60, 62, 64.

*Id.* at *2 (footnote omitted).

156. In footnote 2 of the *Newton* decision, the court notes that Defendant

Walker, "[t]hroughout his motion for summary judgment,"

improperly relies on facts that are contradicted by Newton's version of events. For example, Walker contends that, before Newton was tasered, Newton's shirt had bloodstains on it, suggesting that Newton had been in a violent altercation at some point earlier in the evening. Both Newton and Knighten attest, however, that Newton did not have any blood on his shirt until he was injured by the taser, Newton Dep. 51–52; Knighten Aff. ¶ 11, and Newton denies being in a fight that evening, Newton Dep. 52.

*Id.* at *2 n.2. This demonstrates that Defendant Walker has a history

of lying or suggesting falsities to courts of law when he believes that

doing so will help him avoid liability for his unlawful actions.

157. After Defendant Walker was sued by Newton, and after the court

refused to grant the majority of Defendant Walker's motion for

summary judgment, the City Attorney's Office for Minneapolis recommended that City Council approve a settlement of all claims by paying Mr. Newton $10,000 from the City's coffers *despite the fact that Defendant Walker was acting as an off-duty security guard at the time he violated Mr. Newton's rights*.[6] Thus, despite knowing about Defendant Walker's atrocious and unlawful behavior, rather than disciplining Defendant Walker, the City instead voluntarily attempted to indemnify him for the unlawful acts he performed while off-duty because, as the City Attorney's Office argued, this course of action was "in the best interests of the City."

158.   On February 26, 2015, Defendant Walker was found guilty, *after a jury trial*, of using "excessive force on the Plaintiff on April 3, 2012" in the case of *Barnes v. Officer Richard Walker*, No. 13-cv-1439 (JRT/TNL) (D. Minn. Feb. 26, 2015), Dkt. 56. The jury found that Plaintiff was "entitled to damages in the amount of $14,000.00.

159.   According to the Complaint in *Barnes v. Walker*:

> Shortly after midnight on April 3, 2012, Defendant Walker and four other on-duty police officers entered Barnes' home. When Barnes asked why the five officers were in the home, Defendant Officer Walker ordered him to sit down and stop asking

---

[6] Request for City Council Committee Action From the City Attorney's Office (Dec. 27, 2012), https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/1615663118/2012Newton_v._Walker.pdf?1615663118.

questions. After Barnes sat down, with his hands up, palms facing outward, Defendant Walker attacked him. Specifically, **Defendant Walker pummeled Barnes's head and face with his fists, then pinned him to the ground and shouted "stop resisting." Barnes, however, was not resisting.**

*Barnes v. Walker*, No. 13-cv-1439 (JRT/TNL), Dkt. 1-1, ¶ 1 (emphasis added).

160. The *Barnes* Complaint provides that one of the witnesses to Defendant Walker's conduct "contacted City Council Member Barbara Jones and the Minneapolis Police Department 4th Precinct to report Walker's inappropriate conduct," and "Barnes contacted the Civilian Review Board the very next day to report Walker's conduct." *Id.* ¶¶ 29-30. Somehow, however, Walker was never disciplined despite the fact that a jury found by a preponderance of the evidence that Barnes's allegations of excessive force were bona fide and unconstitutional. Said differently, the City refused to discipline an officer who it knew had violated a private citizen's constitutional rights by repeatedly punching him in the head and face before pinning him to the ground and making it seem as though his actions were warranted by falsely insinuating that they were in response to resisting arrest.

161. After a jury found Defendant Walker liable for Barnes's injuries, the City Attorney's Office, on March 3, 2015, recommended that the City

Council approve a settlement of $66,421.91.[7] Despite this, Defendant Walker was never disciplined.

162. Defendant Grout, between 2015 and 2019, received 9 complaints, all of which resulted in no discipline.

163. Two of Defendant Grout's complaints, 15-18761 and 17-14089, also involved a complaint against Defendant Stetson. Neither officer was disciplined in either instance.

164. Defendant Stetson, between 2015 and 2020, received 7 complaints. Seven of these complaints were closed with no discipline. Two of the complaints, 16-18094 and 20-14212 are still open, which is unusual since one of the open complaints dates back to 2016 or before.

165. One of Defendant Stetson's open complaints, 20-14212, also involves Defendant Tyler Klund, among others, and the case is open for all four officers involved.

166. The above shows that the City of Minneapolis has had numerous opportunities to review the conduct of the named Defendants, but has *never* imposed any real discipline on any of the named officer Defendants, even when the City has been forced to pay out tens of

---

[7] Request for City Council Committee Action From the City Attorney's Office (Mar. 3, 2015), https://d3n8a8pro7vhmx.cloudfront.net/cuapb/pages/270/attachments/original/1615765300/2015ElliotBarnes.pdf?1615765300.

thousands of dollars, or sometimes hundreds of thousands of dollars, in response to the unlawful acts of their officers.

167. The City has been deliberately indifferent to the unlawful acts of their officers, including but not limited to the named officer Defendants, and has indemnified them for unlawful acts committed off-duty and on-duty.

168. By failing to discipline its officers (including Defendants) for conduct that the City knows about and which violated constitutional or federal laws, the City has effectively informed the officers that they are above the law, thereby tacitly authorizing Defendants' unlawful conduct and resultant conspiracy to deprive Plaintiff, and similarly situated individuals, of their civil rights.

169. From 2013 through the first quarter of 2021, the Office of Police Conduct Review ("OCPD") received over 2,500 complaints. Two hundred eighty-three were explicitly listed as "excessive force" complaints; almost 1000 were more generically labeled as "violations of policy or procedure."

170. Only 90 of these more than 2,500 complaints resulted in discipline.

171. Thus, there was "discipline" in only roughly 3.5% of police conduct complaints.

172. MPD's Code of Conduct and Use of Force policy manual in effect at all times relevant to this suit explicitly mandates that officers use only "the amount of force that is objectively reasonable in light of the facts and circumstances… The force used shall be consistent with current MPD training."

173. The lack of discipline in these ongoing incidents of excessive force shows that MPD and the City are not enforcing the policies within the manual, creating a pattern and culture that tolerates the use of excessive force.

174. Illustratively, MPD trained its officers that a "neck restraint" was an authorized form of non-deadly force, and that a "chokehold" was a form of deadly force capable of causing serious bodily injury and/or death.

175. At all times material hereto, MPD defined a "neck restraint" as "[c]ompressing one or both sides of a person's neck with an arm or leg, without applying direct pressure to the trachea or airway (front of the neck)." MPD defined a "chokehold" as "applying direct pressure on a person's trachea or airway (front of the neck)."

176. At all times material hereto, MPD trained its officers that a proper "neck restraint" required the officer to "[c]ompress veins, arteries, nerves & muscles of the neck."

177. Serious bodily injury and/or death are reasonably likely to result from an officer "compress[ing] a person's veins, arteries, nerves & muscles of the neck," regardless of whether direct pressure is applied to the front or back of the neck.

178. The use of a "neck restraint" as defined by MPD constitutes deadly force.

179. The Fourth Amendment prohibits using deadly force in non-deadly circumstances that do not pose an immediate threat of serious bodily injury and/or death.

180. At all times material hereto, MPD's written policies authorized the use of a deadly "neck restraint" in non-deadly circumstances posing no immediate threat of serious bodily injury or death.

181. At all times material hereto, MPD trained its officers to use a "neck restraint" was authorized non-deadly force that officers could use in non-deadly situations.

182. The law enforcement community has long known that using neck restraints on subjects can lead to death.

183. However, from at least April 15, 2012 until June 8, 2020, Minneapolis Police Police Department Policy 5-311 defined a neck restraint as "non-deadly force" and did not warn it can cause death.

184. By policy, the MPD permitted and condoned the use of both conscious and unconscious neck restraints by its officers from at least April 15, 2012 until June 8, 2020.

185. At all times material hereto, MPD's written policies authorized the use of a "neck restraint" in non-deadly circumstances posing no immediate threat of serious bodily injury or death.

186. The City of Minneapolis possessed data indicating that since 2012, neck restraints/holds were used by its police officers on 428 people at an average rate of about one a week.

187. Of those 428 people, 14% who were subjected to a neck restraint/hold lost consciousness.

188. Upon information and belief, MPD officers regularly used neck restraints upon passively resisting arrestees despite not being permitted to do so under policy.

189. Training offered by the City of Minneapolis in 2014 and received by one or more Defendants authorized and instructed on the use of neck restraints by officers, presented it to officers as a "non-deadly force" option, and included instruction on how to employ neck restrains in order to most efficiently render subjects unconscious.

190. Upon information and belief, all training offered by the City of Minneapolis on the use of neck restraints, including that provided to

the Defendant Officers, presented neck restraints as a "non-deadly force" option, and included instruction on how to employ neck restraints in order to most efficiently render subjects unconscious.

191. Training offered by the City of Minneapolis to MPD officers, including Defendant Officers, encouraged officers to "compress veins, arteries, nerves, and muscles of the neck of arrestees."

192. Since at least April 16, 2012, MPD policy has required that "[a]fter a neck restraint or chokehold has been used on a subject, sworn MPD employees shall keep them under close observation until they are released to medical or other law enforcement personnel."

193. Since at least April 16, 2012, the MPD failed to provide its officers with proper policy guidance and training on properly observing and attending to the medical needs of arrestees subjected to neck restraints.

194. At all material times hereto, MPD trained its officers that a "neck restraint" could be used in non-deadly situations despite the fact that it constituted deadly force as utilized by MPD.

195. MPD also trained its officers that striking arrestees in the head, or otherwise using bodily force against arrestees in a manner that causes an arrestee's head to strike an object or surface, was an authorized form of non-deadly force.

196.   At all times material hereto, MPD trained its officers that when an officer strikes an arrestee in the head, or when an officer's use of bodily force against an arrestee causes the arrestee's head to strike an object or surface, all that is required of MPD officers is to have a supervisor conduct a Supervisor Force Review that is limited to noting any reported injury, photographing any visible injuries, and conducting other miscellaneous tasks unrelated to determining whether the subject who had force used against them is suffering from an injury not immediately apparent to the subject or readily visible. *See* Minneapolis Police Police Department Policy 5-307.

197.   On or before July 14, 2020, the MPD failed to provide its officers with proper policy guidance and training on how to properly observe and attend to the medical needs of arrestees subjected to strikes to the head or head injuries resulting from an arrestee's head striking an object or surface after an officer uses bodily force against the arrestee.

198.   Serious bodily injury and/or death is reasonably likely to result from an officer striking an individual in the head or using bodily force against an arrestee in a manner that causes an individual's head to strike an object or surface."

199. The use of strikes to an arrestee's head or bodily force sufficient to cause an arrestee's head to *bounce* off an object or surface constitutes deadly force.

200. The Fourth Amendment prohibits using deadly force in circumstances that do not pose an immediate threat of serious bodily injury and/or death.

201. At all times material hereto, MPD's written policies authorized the use of deadly head strikes and other uses of deadly force in circumstances posing no immediate threat of serious bodily injury or death.

202. At all times material hereto, MPD trained its officers that use of head strikes and the use of bodily force that caused a subject's head to collide with an object or surface were authorized uses of non-deadly force which officers could use in non-deadly situations.

203. The law enforcement community has long known that the use of head strikes or blunt force trauma to the head can lead to death.

204. However, before July 14, 2020, Minneapolis Police Department Policy did not warn that head strikes or bodily force that causes a subject's head to collide with a surface or object can cause death or serious bodily injury.

205.   By policy, the MPD permitted and condoned the use of head strikes and bodily force that causes a subject's head to collide with a surface or object.

206.   The City of Minneapolis possessed data indicating that its police officers used head strikes and bodily force that causes a subject's head to collide with a surface or object.

207.   Of those people subjected by MPD to head strikes or bodily force that caused a subject's head to collide with a surface or object, the City was aware that traumatic brain injuries sometimes resulted.[8]

208.   Upon information and belief, MPD officers regularly used head strikes or bodily force that caused a subject's head to collide with a surface or object upon passively resisting arrestees despite not being permitted to do so under policy.

209.   At all material times hereto, MPD trained its officers that strikes to an arrestee's head, or use of bodily force that causes an arrestee's head to strike an object or surface, could be used in non-deadly situations despite the fact that it constituted deadly force as utilized by MPD.

---

[8] *See* Brandon Stahl, *Ex-Minneapolis Cop Charged With Kick to Face and Brain Injury*, STAR TRIB. (Mar. 16, 2017), https://www.startribune.com/felony-charges-minneapolis-cop-kicked-man-in-face-breaking-his-nose-causing-brain-injury/416243534/.

210.  To the extent that the excessive force used by officers is, in fact,
      "consistent with MPD training," MPD and the City are actively
      encouraging and condoning the use of excessive force in a variety of
      situations.

211.  MPD's culture accepts and allows the use of excessive force as a
      customary part of the job.

212.  All MPD officers are represented by the Police Officer's Federation of
      Minneapolis. The federation provides union representation to all
      officers and negotiates on their behalf with the City.

213.  The Federation's elected president, Lieutenant Robert Kroll ("Kroll"),
      acts as an unofficial policymaker within the MPD. As the president of
      the union, Kroll is an important culture maker in the department, and
      he acts as a de facto policymaker for many of the officers. As
      president, he is elected by MPD officers. Their affirmative choice of
      him as a leader sheds light on the culture of the department.

214.  Kroll is a member of the City Heat motorcycle club, which is known to
      regularly display white supremacist symbols.

215.  Minneapolis permitted so-called "warrior training," which prepares
      police to do battle with civilians, until 2019. Minn. Stat. § 626.8434
      defines "warrior-style training" as "training for peace officers that
      dehumanizes people or encourages aggressive conduct by peace

officers during encounters with others in a manner that deemphasizes the value of human life or constitutional rights, the result of which increases a peace officer's likelihood or willingness to use deadly force."

216. After 2019, the Police Federation, headed by Kroll, offered free warrior training to Minneapolis officers. The union was not subject to censure or reprimand for engaging in this conduct.

217. No efforts were made to prevent officers from engaging in warrior training programs despite a clear awareness regarding its popularity amongst officers and Minneapolis officials' awareness of the propensity to result in violence perpetuated towards citizens.

## **<u>INJURIES</u>**

218. At minimum, the injuries Plaintiff suffered rise to the level of "bodily harm," as defined by Minn. Stat. § 609.02, subd. 7.

219. The injuries Plaintiff suffered further rise to the level of "substantial bodily harm," and also rise to the level of "great bodily harm." *See* Minn. Stat. § 609.02, subds. 7(a), 8.

220. Plaintiff suffered injuries to his head as a result of being slammed to the floor and subsequently stomped on while lying on a tile floor on July 14, 2020. Plaintiff has had ongoing and severe pain in his neck

that has not reacted positively to any of the limited attempts at treatment made by Sherburne County Jail medical staff.

221. Plaintiff was exposed to unnecessary and excessive physical and emotional pain and suffering as a result of Defendant Tyler Klund's use of force against Plaintiff during the course of his arrest.

222. As a result of his injuries from July 14, 2020, Plaintiff suffered bruising to his face, some of which is still visible today.

223. Plaintiff now suffers from almost daily headaches and migraines as a result of Defendants' actions.

224. Plaintiff now suffers from dizzy spells and nausea three to four times per week due to Defendants' actions.

225. Plaintiff experienced extreme sensitivity to bright light after being injured by Defendants. This has improved slightly since the incident, but he continues to experience sensitivity two or three times per week.

226. Plaintiff now experiences issues with his memory and concentration. He has trouble focusing on what he reads and problems with tracking conversations. Plaintiff often experiences short-term memory loss, forgetting things he has recently read, said, or heard.

227. Before July 14, 2020, Plaintiff did not experience any of these symptoms. But for Defendants' actions, Plaintiff would not now be experiencing these symptoms.

228. Plaintiff also sustained two chipped teeth as a result of colliding with the tile floor multiple times on July 14, 2020. But for Defendants' actions, Plaintiff's teeth would not have chipped.

229. Plaintiff has further noticed changes in his handwriting and motor control since the incident. His hands are shaky and twitchy. He did not have this problem before July 14, 2020.

230. At least twice since the incident, Plaintiff experienced dizzy spells so extreme that he vomited. On one of these occasions, he needed a wheelchair to make it to the nurse at Sherburne County Jail.

231. Plaintiff has been provided with various medications to treat his migraines while in Sherburne County Jail by the jail's medical staff. However, these medications make Plaintiff feel like a shell of himself, make him deeply uncomfortable, and otherwise lessen his quality of life. Because he finds being on the medication so unpleasant, Plaintiff occasionally takes some time off of the medication or takes only a limited amount of the medication, simply to feel like himself again. Plaintiff is thus put in a terrible predicament as a result of Defendants' actions—he can either treat the painful migraines he now experiences as a result of Defendants' actions and lose a part of himself in the process, or he can feel like himself at the cost of experiencing a series of

excruciatingly painful migraines. Eventually, the pain always becomes too much to bear, and Plaintiff resumes taking his migraine medicine.

## CLAIMS FOR RELIEF

232. Defendant Tyler Klund's unnecessary and excessive use of force violated Plaintiff's Fourth Amendment right to be free from unreasonable seizures.

233. Defendant Tyler Klund's unnecessary and excessive use of force violated Plaintiff's Fourteenth Amendment rights to substantive and procedural due process.

234. Defendant Minneapolis's custom(s) of encouraging and tacit authorization of MPD's use of excessive force against arrestees, detainees, and the like, was a moving force behind Defendant Tyler Klund's conduct in a manner sufficient for liability to attach under *Monell* and *Canton*. *See Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978); *City of Canton v. Harris*, 489 U.S. 378, 385 (1989).

235. Defendant Tyler Klund's unnecessary and excessive use of force constitutes a common law battery under Minnesota tort law.

236. Defendant Tyler Klund's unnecessary and excessive use of force resulted in a breach of duty, which constitutes common law negligence under Minnesota tort law. Illustratively, Defendant Tyler Klund

breached his statutory duty under Minn. Stat. § 629.32, which states, in relevant part: "A peace officer making an arrest may not subject the person arrested to any more restraint than is necessary for the arrest and detention."

237. Defendant Tyler Klund's unnecessary and excessive use of force also constitutes negligent infliction of emotional distress under Minnesota tort law.

238. All of the named Defendants conspired to deprived Plaintiff of his constitutional rights under the Fourth and Fourteenth Amendments of the United States Constitution.

## Count 1: 42 U.S.C. § 1983 – Fourth Amendment Violation

(Plaintiff v. Tyler Klund)

239. Plaintiff realleges and incorporates herein by reference all preceding and subsequent paragraphs of this Complaint.

240. By throwing Plaintiff to the ground and stomping on his head, neck, and shoulder, Defendant Tyler Klund violated Plaintiff's constitutional right to be free from unreasonable seizures and excessive force.

241. In determining what level of force, if any, is appropriate under the Fourth Amendment, the Court must look to the objective reasonableness of the officer's actions based on "the severity of the

crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham v. Connor*, 490 U.S. 386, 396 (1989).

242. Courts should also consider "the availability of alternative methods of capturing or subduing a suspect." *Retz v. Seaton*, 741 F.3d 913, 918 (8th Cir. 2014) (internal citations omitted).

243. Plaintiff suffered serious harm as a direct and proximate result of Defendants' actions. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

244. Thus, Defendants violated the Fourth Amendment and 42 U.S.C. § 1983.

## **Count 2: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Plaintiff's Substantive Due Process Rights**

### (Plaintiff v. Tyler Klund)

245. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

246. When a defendant acts deliberately, an objective standard is appropriate in the context of excessive force claims brought pursuant

to the Fourteenth Amendment. *Kingsley v. Hendrickson*, 576 U.S. 389, 402 (2015).

247. Whether the force used against an individual violated substantive Due Process rights under the Fourteenth Amendment turns on "the relationship between the need for the use of force and the amount of force used; the extent of the plaintiff's injury; any effort made by the officer to temper or to limit the amount of force; the severity of the security problem at issue; the threat reasonably perceived by the officer; and whether the plaintiff was actively resisting." *Kinglsey*, 576 U.S. at 397.

248. Defendant Tyler Klund did not attempt to de-escalate the confrontation and instead resorted immediately to using excessive force. There was no basis for Defendant Tyler Klund to *reasonably* perceive that he or his fellow officers were in danger, which became especially true once Plaintiff was taken to the ground.

249. Plaintiff suffered serious harm as a direct and proximate result of Defendants' actions. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

250. Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 3: 42 U.S.C. § 1983 – Fourteenth Amendment Violation of Plaintiff's Right to Procedural Due Process

### (Plaintiff v. Tyler Klund)

251.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

252.   "[S]tate statutes may create liberty interests that are entitled to the procedural protections of the Due Process Clause of the Fourteenth Amendment." *Buckley v. Ray*, 848 F.3d 855, 864 (8th Cir. 2017).

253.   Plaintiff had such a liberty interest created by Minn. Stat. § 629.33 to be informed that he was subject to seizure before the arresting officer applied *any* force in seizing him.

254.   Plaintiff also had a liberty interest under Minn. Stat. § 629.32 to be free from "any more restraint than is necessary for his arrest and detention."

255.   Both of these interests relate to Plaintiff's constitutional right to be free from physical seizure without due process of law, a right that is amongst the most important rights guaranteed by the U.S. Constitution.

256.   Plaintiff never presented a risk to officers, irrespective of having a gun on him, because Plaintiff never intended to use the gun on Defendants or any other person. Though Defendants' police reports state that

Plaintiff reached toward his waist and grabbed onto something that the officers believed to be a firearm, the Officers failed to obtain and preserve electronically stored information (*i.e.*, video footage from the inside of JJ Fish and Chicken capable of corroborating or refuting Defendants' narrative) that should have been preserved in the anticipation or conduct of litigation. *See generally* Fed. R. Civ. P. 37(e). Defendants' failure to obtain and preserve this evidence prejudiced Plaintiff by making it impossible for him to conclusively demonstrate that the narrative painted by biased police officers is false. Because Defendants acted with the intent to deprive Plaintiff of JJ Fish and Chicken's indoor security footage in any future civil or criminal litigation, the Court and the jury may and should presume that the security footage from JJ Fish and Chicken's indoor security cameras was unfavorable to Defendants. Fed. R. Civ. P. 37(e)(2)(A). The same is true of any BWC footage of Plaintiff's arrest that was not preserved by Defendants, or that was not disclosed to Plaintiff in his criminal matter or subsequent Open Data request.

257. Force is only authorized in the event of flight or forceful resistance. Plaintiff was not ever a flight or force risk. At minimum, Plaintiff ceased to present a flight or force risk as soon as he was on the restaurant floor. Accordingly, Defendant Tyler Klund's actions in

repeatedly stomping on Plaintiff were unnecessary, and such actions infringed upon Plaintiff's liberty interests in freedom from unnecessarily forceful seizure.

258. Plaintiff suffered serious harm as a direct and proximate result of Defendants' actions. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

259. Thus, Defendants violated the Fourteenth Amendment and 42 U.S.C. § 1983.

## Count 4: 42 U.S.C. § 1983– Conspiracy to Interfere with Civil Rights

(Plaintiff v. Defendants Tyler Klund, Darcy Klund, Steven Mosey, Paul Luther Huynh, Alexandra Dubay, Richard Curtis Walker, Gabriel Daniel Grout, Justin Stetson, and Doe)

260. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

261. Two or more Defendants, including but not limited to Defendants Darcy Klund, Defendant Steven Mosey, and Defendant Tyler Klund, conspired, in their personal and official capacities, to deprive Plaintiff of his civil rights by conspiring to destroy or alter evidence relating to Defendants' arrest of Plaintiff (including but not limited to BWC footage, use of force reports, police reports, etc.) and by conspiring to

allow evidence helpful to Plaintiff and harmful to Defendants (*i.e.*, the security footage from inside JJ Fish and Chicken on the day of the arrest) to spoliate. These conspiracies were entered into (1) "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny [Plaintiff] the equal protection of the laws," (2) to render substantially more difficult Plaintiff's eventual criminal defense efforts and the current civil rights litigation, (3) to excuse or cover up Defendants' use of excessive force against Plaintiff in violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments, (4) to excuse or cover up Defendants' violations of Plaintiff's constitutional rights to procedural and substantive due process under the Fourteenth Amendment, (5) to intimidate Plaintiff into pleading guilty in his criminal proceedings by refusing to collect exculpatory evidence from JJ Fish and Chicken before it was destroyed, (6) to protect Defendant Darcy Klund's son, Defendant Tyler Klund, from criminal or civil liability for his actions that led to Plaintiff's injuries, and/or (7) to insulate the City from civil liability for the actions of its employees (*i.e.*, the Defendants). *See* 42 U.S.C. §§ 1983, 1985(2).

262.  Two or more Defendants, including but not limited to Defendant
      Darcy Klund and Defendant Steven Mosey, conspired, in their
      personal and official capacities, to permit Defendant Tyler Klund's
      father to complete the use of force supervisory report allegedly
      authored by Defendant Steven Mosey relating to Defendant Tyler
      Klund's use of excessive force against Plaintiff during Defendants'
      arrest of Plaintiff.

263.  Two or more Defendants, including but not limited to Defendant
      Darcy Klund, Defendant Steven Mosey, and Defendant Tyler Klund
      conspired, in their personal and official capacities, to ensure that
      neither Defendant Tyler Klund's nor Defendant Steven Mosey's
      potentially exculpatory BWC footage was turned over to Plaintiff's
      criminal defense attorney or in response to Plaintiff's Open Data
      request.

264.  Two or more Defendants, including but not limited to Defendant
      Darcy Klund, Defendant Steven Mosey, Defendant Tyler Klund,
      Defendant Paul Luther Huynh, Defendant Alexandra Dubay,
      Defendant Richard Curtis Walker, Defendant Gabriel Daniel Grout,
      Defendant Justin Stetson, and Defendant Doe(s), conspired, in their
      personal and official capacities, to ensure the spoliation of the indoor
      security footage from JJ Fish and Chicken that captured Defendants'

arrest of Plaintiff and the injuries Defendants' concomitantly inflicted upon Plaintiff. Defendants managed to secure the outdoor security footage of JJ Fish and Chicken before, during, and after the arrest of Plaintiff. It is unbelievable that not one of nine separate MPD officers would think they should also obtain the security footage from inside JJ Fish and Chicken unless the decision to not obtain this evidence was intentional. Any failure by Defendants to obtain that footage was willful and intentional. Defendants did not want to obtain the footage from inside JJ Fish and Chicken because the footage would have been harmful to Defendants' interests and helpful to Plaintiff's interests.

265. Two or more Defendants, including but not limited to Defendant Darcy Klund, Defendant Steven Mosey, Defendant Tyler Klund, Defendant Alexandra Dubay, Defendant Richard Curtis Walker, Defendant Gabriel Daniel Grout, and Defendant Justin Stetson, conspired, in their personal and official capacities, to destroy, alter, or hide the BWC footage of all officers present at Plaintiff's arrest (other than the BWC footage of Defendants Huynh and Doe) which captured Defendants' arrest of Plaintiff and the injuries Defendants' concomitantly inflicted upon Plaintiff.

266. To the extent the Defendants may not have destroyed, altered, or hid BWC footage, the Defendants nonetheless intentionally conspired in

their personal and official capacities, to place themselves to the maximum extent practicable in a position where their BWC would not capture Defendant Tyler Klund's use of excessive force against Plaintiff.

267. To the extent the Defendants may not have destroyed, altered, or hid the BWC footage, and to the extent the Defendants did not intentionally place themselves in a position to where their BWC would not capture Defendant Tyler Klund's use of excessive force against Plaintiff, the Defendants nonetheless conspired, in their personal and official capacities, to intentionally refuse to activate their BWCs and then lie in their police reports by stating that their BWCs were activated in order to lend credence to the false narrative painted by Defendants in Defendants' police reports.

268. Two or more Defendants, including but not limited to Defendant Darcy Klund, Defendant Steven Mosey, and Defendant Tyler Klund conspired, in their personal and official capacities, to interfere with Plaintiff's civil rights by conspiring "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny to [Plaintiff] the equal protection of the laws."

269. Plaintiff suffered serious harm as a direct and proximate result of Defendants' myriad unlawful actions. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

## **Count 5: *Monell* Liability**

(Plaintiff v. Minneapolis)

270. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

271. MPD's Policy Manual provides that the Mayor is "vested with all the powers of said city connected with and incident to the establishment, maintenance, appointment, removal, discipline, control, and supervision of its police force, subject to the limitations herein contained and the provisions of the Civil Service chapter of this Charter, and may make all needful rules and regulations for the efficiency and discipline, and promulgate and enforce general and special orders for the government of the same, and have the care and custody of all public property connected with the Police Department of the City." MPD Policy Manual § 1-301 (citing City Charter reference-Chapter 6, § 1).

272. The Mayor, the City Council, and the Police Chief had final policymaking authority with regard to establishing written policies

and training programs governing the conduct of MPD officers

performing policing functions on behalf of the City.

273.  The Mayor, the City Council, and the Police Chief established and/or

approved of MPD's written policies and training governing the conduct

of MPD officers performing policing functions.

274.  The written policies and training established and/or approved by the

Mayor, the City Council, and the Police Chief constituted the City's

official policy and were the moving force behind and caused Plaintiff's

injuries.

275.  The City, acting by and through its Mayor and/or other policymakers,

had knowledge of MPD's unconstitutional patterns and practices and

knowledge that the same gave rise to a risk of violations of citizens'

federal rights.

276.  The City, acting by and through its Mayor and/or other policymakers,

made a deliberate and/or conscious decision to disregard the known

risk of harm that would result from MPD's unconstitutional patterns

and practices and was deliberately indifferent to and/or tacitly

authorized the same.

277.  On or before July 14, 2020, Minneapolis, with deliberate indifference

to the rights of arrestees, detainees, and the like, tolerated, permitted,

failed to correct, promoted, or ratified a number of customs, patterns,

or practices that failed to provide for the safety of arrestees, detainees, and the like during arrest, including but not limited to the restraint process.

278. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered, or ratified a number of customs, patterns, or practices that condoned and required officers to turn a blind eye to and not intervene with the use of excessive force by MPD officers. This custom is especially pronounced in the subsect of MPD officers within the MPD's police division(s) that include the homicide, robbery, drugs, or weapons units.

279. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, fostered, or ratified a number of customs, patterns, or practices that condoned and required officers to treat members of the Black Community of Minneapolis differently, including but not limited to implementing non-deadly force and deadly force at a higher rate against Black men who did not pose a threat to officers.

280. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted,

failed to correct, promoted, or ratified a number of customs, patterns, or practices that rendered the process of filing misconduct complaints against MPD officers a farce.

281. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that conspired to deprive arrestees, detainees, and the like of their civil rights, including but not limited to obstructing such individuals' access to recovery in federal or state courts.

282. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required that officers refrain from submitting police reports that criticize their fellow officers' use of force even when an officer's use of force was excessive.

283.  On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required that officers lie or omit key details in their police reports in order to protect their fellow officers from civil or criminal liability for misconduct.

284. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that condoned and required that officers must not collect evidence from the scene of an arrest whenever there is a significant chance that the evidence will expose the City, MPD, or MPD officers to potential civil or criminal liability for the actions of MPD officers during the arrest.

285. City officials were and continue to be especially tolerant of excessive use of force by MPD officers who are apprehending individuals suspected of committing violent or firearm-related crimes, even when those suspicions prove to be ill-founded, and even when those suspicions cannot reasonably lead the officers to believe the suspect will be violent towards the officers at the time of the arrest.

286. When City officials receive complaints of excessive force used by MPD officers within the MPD's police division(s) that include the homicide, robbery, drugs, or weapons units, City officials have a custom of absolving those MPD officers of responsibility for their actions, thereby ratifying the use of excessive force by MPD officers in these divisions and signaling to MPD officers in these divisions that future use of excessive force will not result in discipline from the City.

287. The low rate of discipline for police officers accused of using excessive force is a function of City policy and custom.

288. Illustratively, Chapter 172 of Title 9 of the Minneapolis Code of Ordinances ("the Code") delineates the rules governing "Police Conduct Oversight." Sections 172.10-172.40 make it abundantly clear that the Police Conduct Oversight System established by the City puts the power of reviewing civilian complaints made against police largely in the hands of police and other City officials. *Accord* Code of Ordinances, Title 9, § 172.40(1) ("**Each review panel shall be comprised of four (4) panelists. Two (2) of the panelists shall be sworn officers of the police department holding the rank of lieutenant or higher assigned by the chief of police or the chief's designee** and two (2) panelists shall be civilians assigned by the director of civil rights or the director's designee.") (emphasis added).

289. In other words, the City Council has structured the Police Conduct Oversight System in a way that ensures the two police officer members of each review panel can consistently vote that no misconduct occurred as a way to make sure that the Police Conduct Oversight panel can never determine that misconduct has been established by a preponderance of the evidence without the express

consent of the MPD. The moral hazard implicit in such a policy is breathtaking.

290. For the Police Conduct Review panel to sustain an allegation of police officer misconduct, Section 172.40(6) of the Code requires that a "preponderance of the evidence" demonstrates that the allegation has merit. Because the structure of each review panel ensures that the civilians on the panel can never constitute a majority vote, it is thereby impossible for civilians to find that misconduct was committed without the assistance of police officers who are captive to the MPD and its institutional interests. Consequently, it is unsurprising that, historically, Minneapolis has disciplined so few of its police officers accused of misconduct (unless we are to believe that from 2013-2021, an incredible 96.5% of civilian complainants were mistaken in their firmly held belief that a police officer committed misconduct).

291. Making matters worse, even when a preponderance of the evidence demonstrates that an allegation of misconduct is bona fide, the Code does not require that the officer or officers be disciplined. *See generally* Code of Ordinances, Title 9, Chapter 172, § 172.70 (giving the chief of police complete discretion regarding whether to discipline the officer).

292.   Similarly, even when the Police Conduct Review panel recommends discipline, it has no formal authority to issue discipline and must instead send its "recommendation" which is "forwarded to the chief of police." Code of Ordinances, Title 9, Chapter 172, § 172.40(4).

293.   Sections 172. 20, 172.40, and 172.70 of the Code combine to demonstrate that black-letter City policy consolidates *all* disciplinary power over MPD police officers in the chief of police and explicitly permits the chief of police to refuse to discipline MPD officers for misconduct involving (1) use of excessive force, (2) inappropriate language or attitude, (3) harassment, (4) discrimination in the provision of police services or other discriminatory conduct on the basis of race, color, creed, religion, ancestry, national origin, sex, disability, age, or sexual orientation, (5) theft, (6) failure to provide adequate or timely police protection, (7) retaliation, (8) any violation of the MPD's policy and procedure manual, or (9) criminal misconduct *even when a preponderance of the evidence in support of a complaint alleging police misconduct demonstrates that it is more likely than not that misconduct occurred.*

294.   This absurd system explains why the disciplinary rate for police officers is so low in relation to the number of serious misconduct complaints made against MPD officers over several years before July

14, 2020. The policies enacted by Minneapolis to review allegations of police misconduct ensure that a biased decisionmaker—one who relies on having a stable of police officers ready at any given moment—decides whether police officers committed misconduct. The policies enacted by Minneapolis allow the chief of police to determine that a police officer did not commit misconduct and should not be punished for misconduct *even when a wealth of credible and probative evidence compels a contrary conclusion.*

295.  On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices of refusing to discipline MPD officers who have committed misconduct including but not limited to using excessive force against civilians.

296.  Because the City's chief of police has sole control over disciplining MPD police officers who have committed misconduct, any systematic routine failures to discipline MPD officers for misconduct is directly attributable to the City as a function of the City's custom of not disciplining the vast majority of police officers who have committed misconduct as that term is defined by Section 172.20 of the Code. Moreover, because the custom flows from the direct actions of the

City's chief of police, it is abundantly clear that Minneapolis knew this unlawful custom of under disciplining MPD police officers.

297. City officials, including but not limited to the chief of police, the Mayor, the City Council, and members of the Police Conduct Oversight Commission, all understand that the investigations and findings of the Police Conduct Oversight Commission are confidential, especially when the investigations and findings relate to an officer who is deemed an "undercover law enforcement officer," which includes in some capacity most or all of the MPD officers within its division(s) that include the homicide, robbery, drugs, or weapons units, as (1) these units are especially likely to rely on undercover officers, and (2) obtaining personnel data relating to complaints against undercover officers is impossible under the Minnesota Data Practices Act because "[a]ll personnel data maintained by a government entity relaying to an individual employed as or an applicant for employment as an undercover law enforcement officer are [*per se*] private data" not subject to public disclosure. *Accord* Code of Ordinances, Title 9, Chapter 172, § 172.30(f) ("Information from investigations shall be shared only with staff assigned to the office of police conduct review and police conduct oversight commission, unless otherwise specifically authorized by law."); Code of Ordinances, Title

9, Chapter 172, § 172.85 ("The members, staff, and contractors of the office of police conduct review and the police conduct oversight commission shall comply with all of the provisions of the Minnesota Government Data Practices Act, Chapter 13 of Minnesota Statutes. All members and contractors, paid and volunteer, shall sign a contract agreeing to comply with the provisions of the Minnesota Government Data Practices Act, currently Chapter 13 of Minnesota Statutes."); Minn. Stat. § 13.02, subd.8a ("'Not public data' are any government data classified by statute, federal law, or temporary classification as confidential, private, nonpublic, or protected nonpublic."); Minn. Stat. § 13.43, subd.5 ("All personnel data maintained by a government entity relating to an individual employed as or an applicant for employment as an undercover law enforcement officer are private data on individuals. When the individual is no longer assigned to an undercover position, the data described in subdivisions 2 and 3 become public unless the law enforcement agency determines that revealing the data would threaten the personal safety of the officer or jeopardize an active investigation.").

298. The City's custom of under disciplining MPD police officers in circumstances where a preponderance of the evidence demonstrates that an MPD officer committed misconduct, but the Police Conduct

Oversight panel nonetheless determines that a preponderance of the evidence does not demonstrate that misconduct occurred, deprives would-be or actual civil rights plaintiffs of evidence that would assist them in prosecuting civil rights actions under 42 U.S.C. § 1983 against the City or its employees. This custom is the result of a conspiracy by city officials to systematically cover up MPD police misconduct by creating an oversight commission that is set up in a manner that permits MPD to determine whether the evidence in any given complaint shows that misconduct by MPD officers has occurred with the understanding that MPD is a self-serving entity that will protect the interests of itself and its' officers, and, by association, will protect the City's interests in avoiding civil liability traceable to misconduct committed by MPD's officers in the scope of their duties.

299. The course of conduct by City officials, delineated in the preceding paragraphs, constitutes a conspiracy to deprive aggrieved individuals of their civil rights to appear in court and seek redress for their injuries inflicted by MPD officers. Through its actions, City officials are conspiring, *inter alia*, "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny [aggrieved] citizen[s] the equal protection of the laws." *See* 42 U.S.C. § 1985(2).

300. The City is also engaging in a custom of ignoring or covering up misconduct committed by officers within its division(s) that include the homicide, robbery, drugs, or weapons units, or any other division that regularly utilizes one or more undercover officers.

301. When an undercover MPD officer has committed misconduct, within the meaning of Section 172.20 of the Code, City officials—including but not limited to the chief of police, members of the Office of Police Conduct Review, City Council members, and the Mayor—have an unlawful custom of exonerating or otherwise refusing to sustain the allegation against the offending officer, knowing that the officer's undercover status will make it nearly impossible for aggrieved individuals to review the evidence in support of the misconduct complaint or any of the findings or recommendations related to the misconduct complaint because such material is explicitly exempt from public disclosure under Minn. Stat. § 13.43.

302. It is also alleged on information and belief that when an MPD officer who is not an undercover officer is accused of misconduct, it is a common practice of the City to suggest that the applicant apply for employment as an undercover law enforcement officer in order to render any data stemming from the complaint "private data" not subject to public disclosure under the Open Data Act. *See* Minn. Stat.

§ 13.43, subd.5. Likewise, it is alleged on information and belief that when an MPD officer who is not an undercover officer applies to be an undercover officer after being accused of committing misconduct, the City regularly hires the officer accused of misconduct in a new undercover capacity in order to shield any misconduct claims from public disclosure.

303. The course of conduct by City officials, delineated in the three preceding paragraphs, constitutes a conspiracy to deprive aggrieved individuals of their civil rights to appear in court and seek redress for their injuries inflicted by MPD officers. Through its actions, City officials are conspiring, *inter alia*, "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny [aggrieved] citizen[s] the equal protection of the laws." *See* 42 U.S.C. § 1985(2).

304. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices of conspiring to deprive arrestees, detainees, and the like, of their civil rights.

305. Minneapolis had the power to terminate or appropriately discipline MPD officers who were conspiring to deprive citizens of their civil

rights misconduct before July 14, 2020, but failed to do so despite the City's knowledge of a pattern of complaints and actions demonstrating that MPD police officers were lying in their police reports and conspiring to hide evidence helpful to arrestees, detainees, and the like, if that evidence was also harmful to the MPD or its officers.

306.  By refusing to terminate or appropriately discipline MPD officers who have conspired to deprive citizens of their civil rights before July 14, 2020, Minneapolis caused the Defendant Officers to act with impunity and without fear of retribution.

307.  Minneapolis's failure to terminate or properly discipline the Defendant Officers for their role in a conspiracy to deprive Plaintiff of his civil rights is part of its larger custom, policy, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged Defendants Darcy Klund and Steven Mosey, and the other Defendant Officers to continue engaging in unlawful acts towards arrestees, including Plaintiff.

308.  Two or more Defendants conspired, in their personal and official capacities, to deprive Plaintiff of his civil rights by conspiring to destroy or alter evidence relating to Defendants' arrest of Plaintiff (including but not limited to BWC footage, use of force reports, police

reports, etc.) and by conspiring to allow evidence helpful to Plaintiff and harmful to Defendants (*i.e.*, the security footage from inside JJ Fish and Chicken on the day of the arrest) to spoliate. These conspiracies were entered into (1) "for the purpose of impeding, hindering, obstructing, or defeating, in any manner, the due course of justice in any State or Territory, with intent to deny [Plaintiff] the equal protection of the laws," (2) to render substantially more difficult Plaintiff's eventual criminal defense efforts and the current civil rights litigation, (3) to excuse or cover up Defendants' use of excessive force against Plaintiff in violation of Plaintiff's constitutional rights under the Fourth and Fourteenth Amendments, (4) to excuse or cover up Defendants' violations of Plaintiff's constitutional rights to procedural and substantive due process under the Fourteenth Amendment, (5) to intimidate Plaintiff into pleading guilty in his criminal proceedings by refusing to collect exculpatory evidence from JJ Fish and Chicken before it was destroyed, (6) to protect Defendant Darcy Klund's son, Defendant Tyler Klund, from criminal or civil liability for his actions that led to Plaintiff's injuries, and/or (7) to insulate the City from civil liability for the actions of its employees (*i.e.*, the Defendants). *See* 42 U.S.C. §§ 1983, 1985(2).

309. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified a number of customs, patterns, or practices that shall be further identified in discovery.

310. Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, continued to employ Defendants Tyler Klund and Steven Mosey despite knowing of their repeated unconstitutional, unlawful, or other improper conduct.

311. Minneapolis had the power to terminate or appropriately discipline Defendants Tyler Klund and Steven Mosey for their misconduct prior to July 14, 2020, but failed to do so despite the City's knowledge of a pattern of complaints regarding excessive force.

312. By refusing to terminate or appropriately discipline Defendants Tyler Klund and Steven Mosey for their misconduct prior to July 14, 2020, Minneapolis caused Klund and Mosey to act with impunity and without fear of retribution.

313. Minneapolis's failure to terminate or properly discipline Defendants Tyler Klund or Steven Mosey is part of its larger custom, policy, or practice of failing to supervise, terminate, or properly discipline its officers for unconstitutional, unlawful, or otherwise improper conduct, and thereby encouraged Defendants Tyler Klund and Steven Mosey,

and the other Defendant Officers to continue engaging in unlawful acts towards arrestees, including Plaintiff.

314. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, tolerated, permitted, failed to correct, promoted, or ratified its agents, including Lt. Bob Kroll, providing improper and harmful training to officers.

315. Minneapolis had the power to terminate or appropriately discipline Kroll prior to July 14, 2020, but failed to do so despite the City's knowledge of Kroll's perpetuation of dangerous ideology to officers.

316. By refusing to terminate or discipline Kroll or denounce his ideology, Minneapolis caused officers to act with impunity and without fear of retribution.

317. On or prior to July 14, 2020, Minneapolis, with deliberate indifference to the rights of arrestees, detainees, and the like, participated in contract negotiations with the Police Officers Federation of Minneapolis that granted officers powers that allowed them to avoid discipline for misconduct, including but not limited to:

   a. A grievance process that resulted in a nearly 50% rate of overturns of terminations by officers;

   b. The ability to review evidence and video footage prior to giving statements in use of force and misconduct matters;

318.   This participation by the City of Minneapolis caused officers to act with impunity and without fear of retribution.

319.   The unconstitutional policies, practices, and customs defined herein were the moving force behind Plaintiff's injuries.

320.   Plaintiff's injuries occurred as a direct and proximate result of the acts and omissions by Minneapolis.

321.   As a direct and proximate result of the acts and omissions described herein, Plaintiff suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

322.   Plaintiff is entitled to recovery of costs, including reasonable attorney's fees, under 42 U.S.C. § 1988.

## Count 6: *Canton* Liability

### (Plaintiff v. Minneapolis)

323.   Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

324.   Minneapolis failed to properly train or modify its training to Defendant Officers and its other officers, including but not limited to matters related to the reasonable and appropriate use of force during arrests, and intervention in the excessive use of force by fellow officers.

325. Effectuating an arrest, using force to effectuate an arrest, and intervening in the use of force is a usual and recurring situation with which Minneapolis law enforcement officers and other agents encounter on a regular basis.

326. As such, Minneapolis was aware of a need for more and different training. Minneapolis specifically knew that its officers needed training regarding the use of prone restraint and was required to provide its officers with such training.

327. With deliberate indifference to the rights of citizens, Minneapolis failed to provide adequate training to its officers on the use of prone restraint.

328. With deliberate indifference to the rights of citizens, Minneapolis failed to provide adequate training to its officers on identifying and monitoring individuals for head injuries after those individuals have been struck in the head or subjected to bodily force that caused their head to collide with a surface or object.

329. Minneapolis was aware that deprivation of the constitutional rights of citizens was likely to result from its lack of training and the failure to modify its training.

330. As such, Minneapolis was deliberately indifferent and exhibited reckless disregard with respect to the potential violation of constitutional rights.

331. The failure to train and/or appropriately modify training constituted official Minneapolis policies, practices, or customs. Minneapolis's failure to train and/or modify training was behind the Defendant Officers' acts and omissions towards Plaintiff.

332. As a direct and proximate result of Minneapolis's acts and omissions, Plaintiff suffered injuries, experienced pain and suffering, and now suffers from chronic and unrelenting migraines and neck pain.

333. As a direct and proximate result of the acts and omissions described herein, Plaintiff suffered compensatory and special damages as defined under federal common law and in an amount to be determined by a jury.

334. Plaintiff is entitled to recovery of costs, including reasonable attorney's fees under 42 U.S.C. § 1988.

### Count 7: Minn. Stat. § 466.02 – Battery

(Plaintiff v. Minneapolis & Tyler Klund)

335. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

336. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

337. Minnesota law defines the tort of battery "as an intentional unpermitted offensive contact with another." *Paradise v. City of Minneapolis*, 297 N.W.2d 152, 155 (Minn. 1980).

338. Defendant Tyler Klund committed a battery when he forcibly threw Plaintiff to the ground and repeatedly stomped on his head, neck, and shoulders, and continued stomping on Plaintiff when Plaintiff posed no threat to the officers.

339. Defendant Tyler Klund willfully or maliciously apprehended Plaintiff in a manner that violated Plaintiff's constitutional rights and which violated the plain language of Minn. Stat. §§ 629.33 and 629.32. *See generally Soucek v. Banham*, 503 N.W.2d 153, 160-63 (Minn. Ct. App. 1993).

340. Because Defendant Tyler Klund acted intentionally and with reason to believe that using such force without warning or provocation was legally prohibited, he is not entitled to official immunity.

341. Minnesota law holds that "every municipality is subject to liability for its torts and those of its officers, employees and agents acting within the scope of their employment or duties whether arising out of a

governmental or proprietary function." Minn. Stat. § 466.02. This is subject to several exceptions including, pertinently, "claim[s] based upon an act or omission of an officer or employee, *exercising due care*, in the execution of a valid or invalid statute, charter, ordinance, resolution, or rule." Minn. Stat. § 466.02, subd. 5 (emphasis added).

342. As Defendant Tyler Klund failed to exercise due care when he stomped on Plaintiff while Plaintiff was prone and restrained, municipal Defendant Minneapolis is not exempt from liability for Defendant Tyler Klund. *See Craighead v. Lee*, 399 F.3d 954, 963 (8th Cir. 2005) (applying Minnesota law and precluding summary judgment granting immunity to either municipality or officer where decision turned on disputed fact determination).

343. As a direct and proximate result of Defendant Tyler Klund's actions, Plaintiff suffered serious harm. These harms include but are not limited to: physical injury, financial injury, emotional trauma, loss of access to justice, and pain and suffering.

344. Thus, Defendants committed an actionable intentional tort under Minnesota law.

## Count 8: Minn. Stat. § 466.02 – Negligence

(Plaintiff v. Minneapolis & Tyler Klund)

345. Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

346. Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

347. In stomping on Plaintiff and causing his head to hit the hard tile floor multiple times, and by repeatedly stomping on Plaintiff's neck and shoulders, Defendant Tyler Klund "fail[ed] to act as a reasonable and prudent police officer in the same or similar circumstance." *Kari v. City of Maplewood*, 582 N.W.2d 921, 924 (Minn. 1998).

348. Defendant Tyler Klund owed Plaintiff the duty of apprehending him in a constitutionally reasonable manner.

349. Defendant Tyler Klund owed Plaintiff a duty not to unnecessarily harm him in the execution of his arrest.

350. Defendant Tyler Klund owed Plaintiff a duty to comply with Minn. Stat. §§ 629.33 and 629.32, which impose the statutory duties on police officers of using only the minimally necessary force to accomplish an arrest.

351.    Defendant Tyler Klund breached each of his duty/duties owed to
        Plaintiff when he repeatedly stomped on Plaintiff's head, neck, and
        shoulders, causing his head to collide with the tile floor multiple times
        and otherwise causing severe and lasting physical injury to Plaintiff's
        neck area.

352.    Defendant Tyler Klund's failure to comply with Minn. Stat. §§ 629.33
        and 629.32 constitutes negligence *per se*.

353.    Defendant Tyler Klund willfully or maliciously apprehended Plaintiff
        in a manner that violated his constitutional rights, and which violated
        the plain language of Minn. Stat. §§ 629.33 and 629.32. *See generally*
        *Soucek v. Banham*, 503 N.W.2d 153, 160-63 (Minn. Ct. App. 1993).

354.    As a direct and proximate result of Defendant's actions, Plaintiff
        suffered serious harm including but not limited to physical injury,
        financial injury, emotional trauma, loss of access to justice, and pain
        and suffering.

355.    Thus, Defendants committed an actionable negligence tort under
        Minnesota law.

## Count 9: Minn. Stat. § 466.02 – Negligent Infliction of Emotional Distress

### (Plaintiff v. Minneapolis & Tyler Klund)

356.  Plaintiff realleges and incorporates herein by reference all preceding and all subsequent paragraphs of this Complaint.

357.  Supplemental jurisdiction is proper given that this claim arises from a "common nucleus of operative fact." 28 U.S.C. § 1367; *Gibbs*, 383 U.S. 725 (1966).

358.  The tort of negligent infliction of emotional distress is established when a plaintiff "is within a zone of danger of physical impact, reasonably fears for his or her own safety, and consequently suffers severe emotional distress with resultant physical injury." *Bohdan v. Alltool Mfg., Co.*, 411 N.W.2d 902, 907 (Minn. Ct. App. 1987).

359.  In using unreasonable and disproportionate force while Plaintiff was prone with his hands behind his back, Defendant Tyler Klund placed Plaintiff directly in such a "zone of danger." Plaintiff reasonably feared for his safety as a result of the officer's actions, and he suffers emotional distress as a result of the incident.

360.  Defendant Tyler Klund willfully or maliciously apprehended Plaintiff in a manner that violated his constitutional rights, which provides an exemption to the "zone of danger" requirement in establishing

negligent infliction of emotional distress. *Bohdan*, 411 N.W.2d at 902 (citing *State Farm Mut. Auto. Ins. Co. v. Village of Isle*, 122 N.W.2d 36, 41 (Minn. 1963)).

361.   As a direct and proximate result of Defendants' actions, Plaintiff suffered serious harm. These harms include but are not limited to extreme emotional distress. As a result of Defendants' actions and the harms that flow from Defendants' actions, Plaintiff is now suffering from depression, anxiety, numerous and constant painful migraines, feeling like less of himself when he takes medication for the pain he suffered that is directly related to Defendants' actions, a consistently painful neck and neck stiffness, inability to sleep as a result his pain, and memory loss. The emotional distress Plaintiff is suffering from is severe, and Plaintiff's distress has attendant physical manifestations.

362.   Thus, Defendants committed an actionable tort of negligent infliction of emotional harm under Minnesota law.

## **RELIEF REQUESTED**

WHEREFORE, Plaintiff respectfully requests that this Court grant the following relief:

A.   As to Counts 1-3, a money judgment against Defendant Tyler Klund for compensatory, special, and punitive damages, and punitive damages

together with costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

B.    As to Count 4, a money judgment against Defendants Tyler Klund, Darcy Klund, Steven Mosey, Paul Luther Huynh, Alexandra Dubay, Richard Curtis Walker, Gabriel Daniel Grout, Justin Stetson, and Doe, or any combination thereof, for compensatory, special, and punitive damages, and punitive damages together with costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

C.    As to Count 5, a money judgment against Defendant City of Minneapolis for compensatory and special damages in an amount to be determined together with costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

D.    As to Count 6, a money judgment against Defendant City of Minneapolis for compensatory and special damages in an amount to be determined together with costs and disbursements, including reasonable attorney's fees, under 42 U.S.C. § 1988 and prejudgment interest.

E.    As to Counts 7-9, a money judgment against Defendants Tyler Klund and the City of Minneapolis for compensatory and special damages in

an amount to be determined together with costs and disbursements, including prejudgment interest.

F.     Appoint a receiver or similar authority to ensure that the City of Minneapolis properly trains, supervises, and disciplines its police officers.

G.     Grant such other relief as may be just and reasonable.

## **DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial on all issues which may be tried by a jury pursuant to Rule 38 of the Federal Rules of Procedure.

DATED: May 24, 2021               Respectfully submitted,

_/s/ Nico Ratkowski_

NICO RATKOWSKI
MN Attorney ID: 0400413
Contreras & Metelska, P.A.
200 University Avenue W., STE 200
Saint Paul, Minnesota 55103
P: (651) 771-0019
F: (651) 772-4300
nico@contrerasmetelska.com

_Attorney for Plaintiff_

## <u>VERIFICATION OF COMPLAINT</u>

Nico Ratkowski, under penalty of perjury, states the following:

1. That he is an attorney employed by Contreras & Metelska, PA, the

   attorneys for Plaintiff in this case.

2. That he affirms the truth of the contents thereof upon information and

   belief, and he believes same to be true, and he further states that the

   sources of this information and belief are documents provided to him by

   Plaintiff, Defendant(s), and third-party witnesses.

DATED: May 24, 2021                    Respectfully submitted,

                                       <u>/s/ Nico Ratkowski</u>
                                       Nico Ratkowski
                                       MN Attorney ID: 0400413
                                       Contreras & Metelska, P.A.
                                       200 University Avenue W., STE 200
                                       Saint Paul, Minnesota 55103
                                       P: (651) 771-0019
                                       F: (651) 772-4300
                                       nico@contrerasmetelska.com

                                       *Attorney for Plaintiff*